## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| WKW NORTH AMERICA, LLC,<br><br>               Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>               Defendant,<br><br>    and<br><br>ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,<br><br>               Defendant-Intervenor. | Court No. 21-00072 |

## MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF
## WKW NORTH AMERICA, LLC
## IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Douglas J. Heffner
Richard P. Ferrin (lead)
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803
*Counsel for Plaintiff*

Leslie A. Glick
**BUTZEL LONG**
1909 K Street, N.W.
Washington, DC 20006
(202) 454-2839
*Counsel for Plaintiff*

Dated: June 21, 2021

ACTIVE.127147537.15

# **TABLE OF CONTENTS**

I.    STATEMENT PURSUANT TO RULE 56.2. ........................................................................ 1

   A.   Administrative Determination to be Reviewed. .................................................... 1

   B.   Issues Presented. ................................................................................................ 1

II.   STANDARD OF REVIEW. ............................................................................................ 2

III.  ARGUMENT. ................................................................................................................ 4

   A.   Background. ........................................................................................................ 4

      1.   Brief Description of the Products at Issue. ................................................ 4

      2.   The Relevant Scope Language. ................................................................. 5

   B.   Commerce's Scope Determination Is Not in Accordance With Law Because It Narrows
        the Finished Merchandise Exemption in a Manner Contrary to the Plain Language of the
        Scope. ................................................................................................................ 7

      1.   Commerce Redefines the Term "Subassemblies" in a Manner Inconsistent With the
           Plain Language of the *Orders*. ............................................................... 7

      2.   Commerce Redefines the Term "Finished Merchandise" in a Manner Inconsistent
           With the Plain Language of the *Orders*. ................................................ 8

      3.   In Fact, However, the Scope Language Recognizes that a Product Can Be Both a
           "Subassembly" and Excluded from the Scope by the Finished Merchandise Exemption. .... 10

      4.   Commerce's Interpretation of the Finished Merchandise Exemption Is Not Entitled to
           Deference. ............................................................................................. 12

      5.   Commerce's New Interpretation of the Finished Merchandise Exemption Leads to the
           Same Absurd Results That It Sought to Avoid in Its Previous Longstanding "Subassemblies
           Test" Interpretation. ............................................................................. 14

      6.   The *Meridian* Federal Circuit Case Does Not Require Commerce to Rewrite the
           Definition of "Subassemblies" and "Finished Merchandise." ............................. 18

   C.   Commerce's Scope Determination Is Unsupported by Substantial Evidence Because It
        Ignores Record Evidence That WKW's Waist Finishers, Belt Moldings, and Outer Waist Belts
        Require No Further Finishing or Fabrication, and Are Fully and Permanently Assembled and
        Completed at the Time of Entry, and Therefore Constitute Finished Merchandise. ................ 20

      1.   WKW Presented Significant Record Evidence That WKW's Waist Finishers, Belt
           Moldings, and Outer Waist Belts Is Finished Merchandise. ................................. 20

      2.   The Court Should Reject Commerce's Attempt to Portray WKW's Waist Finishers,
           Belt Moldings, and Outer Waist Belts as Somehow "Unfinished" Based on an "Independent
           Function" Test. ...................................................................................... 21

   D.   Commerce's Scope Determination Is Unsupported by Substantial Evidence Because It
        Does Not Perform Any Real Analysis of the (k)(1) Sources. ................................... 25

IV.   CONCLUSION AND PRAYER FOR RELIEF. ............................................................ 31

**TABLE OF AUTHORITIES**

**Cases**

*Auer v. Robbins*, 519 U.S. 452 (1997) ............................................................. 13

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ......................... 13

*Columbia Alum. Prods., LLC v. United States*, ___CIT ___, 470 F. Supp. 3d 1353 (2020) ...... 12

*Consol. Edison v. Nat'l Labor Relations Bd.*, 305 U.S. 197 (1938) ............................................ 3

*Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Fed. Cir. 2002) ................................ *passim*

*Ekstrom Indus., Inc. v. United States*, 254 F.3d 1068 (Fed. Cir. 2001) ............................ 2, 7, 12

*Kisor v. Wilkie*, 139 S.Ct. 2400 (2019) ................................................................... 13

*Meridian Prods., LLC v. United States*, 851 F.3d 1375 (Fed. Cir. 2017) ........................ 3, 10, 17

*Meridian Prods., LLC v. United States*, 890 F.3d 1272 (Fed. Cir. 2018) ...................... 18, 19, 28

*Meridian Prods., LLC v. United States*, ___ CIT ___, 357 F. Supp. 3d 1351 (2019) ............... 19

*Meridian Prods., LLC v. United States*, No. 13-00246, 2020 WL 1672840 (Ct. Int'l Trade
    Apr. 6, 2020) ................................................................................... 19

*Mid-Continent Nail Corp. v. United States*, 725 F.3d 1295 (Fed. Cir. 2013) ...................... 10, 13

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372 (Fed. Cir. 2001) .................. 13

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351
    (Fed. Cir. 2015) .......................................................................... 2, 27

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 41 CIT ___, 279 F. Supp. 3d
    1209 (2017), *aff'd*, 918 F.3d 1355 (Fed Cir. 2019) ....................................... 4

*United States & Fasteners, Inc. v. United States*, 947 F.3d 794 (Fed. Cir. 2020) .................... 13

*Whirlpool Corp. v. United States*, ___ CIT ___, 144 F. Supp. 3d 1296 (2016) ...................... 29

*Whirlpool Corp. v. United States*, 890 F.3d 1302 (Fed. Cir. 2018) .......................................... 29

*Whirlpool Corp. v. United States*, ___ CIT ___, 357 F. Supp. 3d 1358 (2019) ...................... 29

*Worldwide Door Components, Inc. v. United States*, ___ CIT ___, 466 F. Supp. 3d 1370
    (2020) .............................................................................. 10, 11, 12

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................... 2

**Regulations**

19 C.F.R. § 351(k)(1) ............................................................................... *passim*

19 C.F.R. § 351.225(k)(2) ........................................................................ 3, 30, 31

**Administrative Determinations**

*Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,650 (Dep't of
     Commerce May 26, 2011) (AD order) ................................................... *passim*

*Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,653 (May 26, 2011)
     (CVD order) ..................................................................................... *passim*

**Other Authorities**

3 Charles H. Koch, Jr., *Administrative Law and Practice* (3d ed. 2015) ...................................... 4

# I. STATEMENT PURSUANT TO RULE 56.2.

## A. Administrative Determination to be Reviewed.

In this action, Plaintiff WKW North America, LLC ("Plaintiff" or "WKW") asks the Court to review a scope determination by the U.S. Department of Commerce ("Commerce") regarding the antidumping and countervailing duty orders on Aluminum Extrusions from the People's Republic of China (the *"Orders"*). *See generally* Final Scope Ruling, Antidumping Duty PD 49 at bar code 4081567-01 (Jan. 28, 2021) (hereinafter "Scope Ruling"). In the Scope Ruling, Commerce determined that WKW's waist finishers, belt moldings, and outer waist belts are within the scope of the *Orders*. WKW believes that the findings as to the aforementioned products in the Scope Ruling are not supported by substantial evidence or in accordance with law, but does not take issue with the balance of the Scope Ruling.

## B. Issues Presented.

1. *Did Commerce misinterpret the terms "subassemblies" and "finished merchandise" exemption in a manner contrary to the plain meaning of the scope language?*

   Yes. Commerce defined the two terms as mutually exclusive, even though the *Orders* did not.

2. *Was Commerce's determination that WKW's waist finishers, belt moldings, and outer waist belts do not constitute "finished merchandise" unsupported by substantial evidence?*

   Yes. WKW demonstrated in the administrative proceeding below that its waist finishers, belt moldings, and outer waist belts constitute "finished merchandise" and Commerce's determination to the contrary is unsupported by substantial evidence.

3. *Was Commerce's analysis of the sources described in 19 C.F.R. § 351.225(k)(1) unsupported by substantial evidence?*

Yes. Commerce performed no real analysis of the sources described in 19 C.F.R. § 351(k)(1), other than to set forth brief excerpts of several past scope rulings concerning the "finished merchandise" and "finished goods kits" exemptions to the *Orders*. Even as to these prior rulings, Commerce should have construed them so as to be consistent with each other and the case law construing the *Orders*; instead, Commerce said that its interpretations were evolving.

## II.     STANDARD OF REVIEW.

Section 516A of the Tariff Act of 1930 directs the Court to hold unlawful any "determination, finding, or conclusion" that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

The first issue raised pertains to Commerce's construction of the language in the *Orders* themselves. In reviewing a scope ruling by Commerce, the Federal Circuit has recognized that "[t]he language of the order is the 'cornerstone' of a scope analysis and 'a predicate for the interpretive process.'" *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) (quoting *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002)). Although this Court grants deference to Commerce in the interpretation of its orders, Commerce "cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *Ekstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001). In fact, "orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel,* 296 F.3d at 1089.

The first step in the analysis—as it is with any writing—is to determine whether it contains an ambiguity and, thus, is susceptible to interpretation. *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017). "If the scope is unambiguous, it governs." *Id*. "[T]he question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that [the courts] review de novo." *Id*. at 1382. "A scope determination is not in accordance with the law if it changes the scope of an order or interprets an order in a manner contrary to the order's terms." *Id*. (cleaned up). Subsequently, "[t]he question of whether a product meets the unambiguous scope terms presents a question of fact reviewed for substantial evidence." *Id*.

If the scope language is ambiguous, then Commerce (and by extension, the Court) turns to the sources described in 19 C.F.R. § 351.225(k)(1), although those sources "cannot substitute for language in the order itself." *Id*. (citation omitted). The "(k)(1)" sources consist of "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). Finally, if the (k)(1) criteria are not dispositive, Commerce then must further consider several other factors, described in 19 C.F.R. § 351.225(k)(2), including the physical characteristics of the product, the expectations of the ultimate purchasers, the ultimate use of the product, the channels of trade in which the product is sold, and the manner in which the product is advertised and displayed. 19 C.F.R. § 351.225(k)(2).

The second two issues presented in Section I.B above are subject to "substantial evidence" review. "Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support the conclusion reached. *Consol. Edison v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938). Put another way, "substantial evidence is best understood as a

formula connoting reasonableness review."  3 Charles H. Koch, Jr., *Administrative Law and Practice* § 9.24[1] (3d ed. 2015); *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 41 CIT ___, ___, 279 F. Supp. 3d 1209, 1212 (2017), *aff'd*, 918 F.3d 1355 (Fed Cir. 2019).

## III.  ARGUMENT.

### A.  Background.

#### 1.  Brief Description of the Products at Issue.

Plaintiff WKW requested that Commerce provide a scope ruling on the following products: (1) rear quarter finishers (which are produced from aluminum sheet, not extrusions); (2) rubber seals imported independently of any aluminum part; and (3) waist finishers, belt moldings, and outer waist belts, which are assemblies composed of finished extruded aluminum trim with rubber seals.  Scope Ruling, at 6.  In this action, Plaintiff WKW challenges Commerce's scope determination only with respect to the third category of products, namely the waist finishers, belt moldings, and outer waist belts.

The waist finishers, belt moldings, and outer waist belts consist of specifically designed and extruded aluminum trim with rubber seals attached at the time of importation that are sold to automobile manufacturers for installation into certain automobiles.  Scope Ruling Request, at 3, Antidumping Duty PD 10 at bar code 3855154-01 (June 28, 2019) (hereinafter "6-28-19 Scope Request") *see also* Scope Ruling Request, Exhibits 1, 2, & 3, Antidumping Duty PD 23 at bar code 3953659-03 (Mar. 13, 2020) (hereinafter "3-13-20 Scope Request").  The terms "waist finishers," "belt moldings," and "outer waist belt" all refer to essentially the same automobile window trim products, as applied to different car makes and models.  *Id.*  The terms are used both collectively and interchangeably in this brief.  For the convenience of the Court, pictures of these products are attached hereto as Appendix A.

For these products, before importation, the aluminum is fabricated into a specific shape as requested by the automobile manufacturer. 6-28-19 Scope Request, at 3. A rubber seal is then attached to each of these aluminum parts. *Id*. This seal is designed to prevent liquid or other materials from entering into the interior of the automobile after the complete downstream assembly. *Id*. When imported, these products are fully fabricated and finished, and do not require any further fabrication or additional work prior to their installation by Original Equipment Manufacturers ("OEMs"). *Id*.

WKW's automobile window trim is not designed to fit into another *component or assembly*. WKW Letter re Schletter Grounding Clamps Ruling, at 2-3, Antidumping Duty PD 38 at bar code 4019281-01 (Aug. 24, 2020). Rather, WKW sends the trim with a seal attached, *as is*, to the OEM, which attaches it directly on the automobile. *Id*. at 3. The OEM operates the assembly line in which the OEM directly attaches the trim with the seal to the relevant portion of the vehicle. *Id*. As explained in an affidavit by James Goodson, Engineer and Program Manager for BMW Parts at WKW, "WKW does not sell the trim with a seal to Tier 1 companies that produce assemblies. Rather, WKW sells the product directly to the [OEM] that assembles the vehicle." Response of WKW to Comments of the AEFTC, Affidavit of James Goodson (herein "Goodson Affidavit") ¶ 6, Antidumping Duty PD 37 at bar code 4015780-01 (Aug. 14, 2020). After the OEM paints the exterior of the vehicle, "the OEM attaches the trim directly to the relevant portion of the vehicle. The OEM does nothing to the trim other than to attach it 'as is' to the relevant portions of the vehicle." *Id*. ¶ 9.

### 2. The Relevant Scope Language.

The portions of the scope language that are relevant to this proceeding are as follows:

First, the scope states that the merchandise covered "is aluminum extrusions which are shapes and forms, produced by an extrusion process, made from [certain] aluminum alloys …."

*Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011) (AD order) (hereinafter "*AD Order*"); *Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,653 (May 26, 2011) (CVD order) (collectively, the "*Orders*").[1]

Second, the scope states that it "includes the aluminum extrusion components that are attached (*e.g.*, by welding or fasteners) to form subassemblies, *i.e.* partially assembled merchandise unless imported as part of the finished goods 'kit' defined further below. The scope does not include the non-aluminum extrusion components of subassemblies or subject kits." *AD Order*, 76 Fed. Reg. at 30,651.

Third, the scope language includes the following exclusions:

> The scope also excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels. The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the *Orders* merely by including fasteners such as screws, bolts, *etc.* in the packaging with an aluminum extrusion product.

*Id.*

---

[1] The scope text of the AD and CVD orders are materially the same, therefore all quotations herein cite to the *AD Order*.

**B.  Commerce's Scope Determination Is Not in Accordance With Law Because It Narrows the Finished Merchandise Exemption in a Manner Contrary to the Plain Language of the Scope.**

The fundamental flaw in Commerce's scope determination is that it does not simply apply the terms "subassemblies" and "finished merchandise," both of which are defined in the scope language itself.  Instead, Commerce acknowledges the definitions in the text of the scope, but then makes a series of assertions that broadens the definition of "subassemblies" so extensively, while narrowing its interpretation of "finished merchandise" so greatly, that it re-writes the plain language of the scope.  This Commerce cannot do.  *See Ekstrom Indus.*, 254 F.3d at 1072 (stating that Commerce "cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms").

**1.  Commerce Redefines the Term "Subassemblies" in a Manner Inconsistent With the Plain Language of the *Orders*.**

As noted above, the text of the *Orders* defines subassemblies as "partially assembled merchandise unless imported as part of the finished goods 'kit' defined further below."  *AD Order*, 76 Fed. Reg. at 30,651.  In the Scope Ruling, Commerce states that "'[s]ubassemblies' is broadly defined in the scope as 'partially assembled merchandise,' which we understand to be distinct from products which are 'fully and permanently assembled and completed' finished merchandise."  Scope Ruling, at 22.  Instead of limiting its analysis to the identified class, Commerce opined that "[a] subassembly could also be described as an *intermediate product* or any other partially assembled product that is less than the full, permanent, and completed final finished product which satisfies the finished merchandise exclusion" *id*. (emphasis added), and then as any "intermediate product," *id*.  More specifically, Commerce completely redefines a "subassembly" as "merchandise which is designed for the sole purpose of becoming part of a larger whole."  *Id*. at 26 (internal quotation marks omitted).

Commerce elaborates further that "[i]n examining whether the aluminum extrusion components of an assembly are within the scope pursuant to the subassemblies language, or whether the entire assembly is excluded under the finished merchandise exclusion, we must consider whether the product is "partially assembled," as opposed to "fully and permanently assembled and completed."  Scope Ruling, at 22.  Again, this statement, standing alone, is consistent with the plain scope language.  However, Commerce then goes beyond the text of the scope by asserting that "the fact that the subassembly could be described in its own right with reference to end use, or that such subassembly requires no further fabrication or assembly to perform its function as a subassembly, does not mean that it will constitute finished merchandise under the exclusion."  *Id*.  As such, Commerce incorrectly has separated two overlapping terms into two mutually exclusive categories.

2.    **Commerce Redefines the Term "Finished Merchandise" in a Manner Inconsistent With the Plain Language of the *Orders*.**

The text of the *Orders* expressly defines "finished merchandise containing aluminum extrusions" as "parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels."  *AD Order*, 76 Fed. Reg. at 30,651.  Following its redefinition of the term "subassembly," however, Commerce improperly re-writes the scope language by asserting that "finished merchandise" cannot include "subassemblies"[2]—as it redefined the term.

_____

[2] *Commerce* makes the incorrect assertion that a "subassembly" cannot also satisfy the "finished merchandise" test because of the following sentence in the scope language:

> The scope includes the aluminum extrusion components that are attached (*e.g.*, by welding or fasteners) to form subassemblies, *i.e.*, partially assembled

Thus, Commerce found, based on the scope language and the structure of the scope as a whole, a delineation in the scope among three categories of products: (1) aluminum extrusion components that are already attached to form subassemblies, *i.e.*, assembled, upon importation (not excluded); (2) aluminum extrusions components in a packaged combination of parts that are unassembled at the time of importation, and that will undergo assembly upon importation into a final finished good (excluded under the finished good kit exclusion); and (3) finished merchandise containing extrusions as parts that are fully and permanently assembled and completed at the time of entry (excluded under the finished merchandise exclusion), *but which does not include a subassembly*.

Scope Ruling, at 23 (emphasis added).

---

merchandise unless imported as part of the finished goods 'kit' defined further below.

Scope Ruling, at 23. Because this sentence mentions "subassemblies" but not "finished merchandise," according to Commerce, "the lack of such express language supports an interpretation that products which satisfy the subassemblies language cannot be excluded under the finished merchandise exclusion." *Id.* & n.146 (citing *Meridian Door Handles Second Remand*, Comments on WKW's Scope Ruling Request, Exhibit 1 at 20-23, Antidumping Duty PD 14 at bar code 3868681-01 (July 25, 2019)). In the *Meridian Door Handles Second Remand*, Commerce argued that if it had intended to consider "subassemblies" to be capable of also qualifying for the "finished merchandise" exclusion, the sentence would have been written as follows:

The scope includes the aluminum extrusion components that are attached (*e.g.*, by welding or fasteners) to form subassemblies, *i.e.*, partially assembled merchandise unless imported as part of the finished goods 'kit' ***or finished merchandise exclusion***.

*Meridian Door Handles Second Remand*, at 22. Commerce's interpretation, however, is contrary to the unambiguous scope language. First, the entire phrase after the "*i.e.*" signal constitutes the full scope definition of "subassemblies," not just the phrase "partially assembled merchandise." As such, addition of the phrase "or finished merchandise exclusion" does not appear in the sentence because *it makes no sense* to add that additional phrase to the definition of "subassemblies." This is reinforced by the fact that there is no comma after the phrase "partially assembled merchandise." Instead, the term "unless imported as part of the finished goods 'kit'" simply means that partially assembled merchandise is not considered to be a "subassembly" if it is part of a finished goods kit. As such, it is wrong for Commerce to conclude that this sentence somehow implies that a subassembly can never meet the finished merchandise exclusion.

3. **In Fact, However, the Scope Language Recognizes that a Product Can Be Both a "Subassembly" and Excluded from the Scope by the Finished Merchandise Exemption.**

Contrary to Commerce's artificial distinction, there is no express language in the scope that categorically excludes all merchandise—subassemblies or assemblies—from the finished merchandise exemption simply because they are incorporated into a downstream product. Its artificial linguistic chasm "changes the scope of an order or interprets an order in a manner contrary to the order's terms." *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017). As such, it is a rewriting of the scope language and not merely an interpretation. *Id*.

It is settled law that merchandise covered by a scope exclusion is excluded from the order. *See Mid-Continent Nail Corp. v. United States*, 725 F.3d 1295, 1301 (Fed. Cir. 2013) (stating that "just as orders cannot be extended to *include* merchandise that is not within the scope of the order as reasonably interpreted, merchandise facially covered by an order may not be *excluded* from the scope of the order unless the order can reasonably be interpreted so as to exclude it") (emphasis original); *Worldwide Door Components, Inc. v. United States*, ___ CIT ___, ___, 466 F. Supp. 3d 1370, 1377 (2020) (stating that "[i]n ruling on a scope issue, Commerce must interpret scope language rather than attempt to change it" and that "[s]cope language creating a specific exclusion from the general scope language is no exception to this principle").

Commerce ignored this interpretive principle by elevating its characterization of subassemblies over the exclusion, rather than beginning with the exclusion and then considering how the definition of subassembly impacts that analysis—if it does. *See* Scope Ruling, at 23 (concluding that "products which satisfy the subassemblies language cannot be excluded under the finished merchandise exclusion"). According to Commerce's reinterpretation of the scope

10

language, merchandise that is designed to become part of a larger whole is subject to the *Orders* as a subassembly and so Commerce's reasoning goes, is automatically disqualified from the finished merchandise exclusion. *See id*. at 26 (stating that "WKW's window trims are designed to be part of a downstream final product" and therefore "the window trims are not themselves finished merchandise which perform a function independent of the automobile"). In other words, Commerce's scope analysis does not focus on whether WKW's waist finishers, belt moldings, and outer waist belts are covered by the *Order's* scope—as a finished and/or fabricated aluminum extrusion, or aluminum extrusions that form subassemblies—and, if so, whether the finished merchandise exclusion applies. Instead, Commerce's test reduces the issue of whether WKW's waist finishers, belt moldings, and outer waist belts are intermediate products.

As a result, Commerce does not correctly answer the question of whether WKW's waist finishers, belt moldings, and outer waist belts actually constitute "finished merchandise containing aluminum extrusions as parts," based on the definition in the scope language that finished merchandise is "fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." *AD Order*, 76 Fed. Reg. at 30,651.

This is a problem similar to that this Court addressed in *Worldwide Door Components*. In that case, Commerce refused to determine whether the imported products at issue (assembled door thresholds) satisfy the requirements of the finished merchandise exclusion, and the Court held that Commerce erred in that refusal, and remanded so that Commerce would "give full and fair consideration to the issue of whether this exclusion applies …." *Worldwide Door*

*Components*, 466 F. Supp. 3d at 1380; *see also Columbia Alum. Prods., LLC v. United States*,

___CIT ___, ___, 470 F. Supp. 3d 1353, 1362 (2020) (same).

In the Scope Ruling, Commerce disputes WKW's argument below that the fact pattern in *Worldwide Door Components* and *Columbia Aluminum Products* is similar to the fact pattern in the instant scope inquiry. Scope Ruling, at 27 (citing WKW Letter re Worldwide Door Components CIT Ruling, Antidumping Duty PD 41 at bar code 4022608-01 (Sept. 3, 2020)). Commerce insists that unlike those two other cases, here Commerce did indeed examine the finished merchandise exclusion with respect to WKW's waist finishers, belt moldings, and outer waist belts. Scope Ruling, at 27. That statement is unsupported by substantial evidence, because the administrative record shows that Commerce instead determined that WKW's waist finishers, belt moldings, and outer waist belts are "subassemblies" and therefore, *ipso facto*, cannot qualify for the finished merchandise exclusion. *See id*. at 26 (stating that "WKW's window trims are less than the full, permanent, and completed final product, the automobile," because they are instead subassemblies, which Commerce redefined as "merchandise which is designed for the sole purpose of becoming part of a larger whole") (internal quotation marks omitted).

### 4. Commerce's Interpretation of the Finished Merchandise Exemption Is Not Entitled to Deference.

As explained in Section II above regarding the standard of review, although this Court grants deference to Commerce in the interpretation of its orders, Commerce "cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *Ekstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001). In fact, "orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel,* 296 F.3d at 1089.

The extent to which this Court defers to Commerce's interpretation of scope language under *Duferco Steel* is not precisely the same as *Chevron* deference to an agency interpretation of a statute it administers. *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) and applying *Chevron* to Commerce administrative proceedings interpreting statutory terms in the Tariff Act of 1930). Nor is the *Duferco Steel* level of deference precisely the same as in *Auer* or *Kisor* deference to an agency interpretation of its own regulation, *see United States & Fasteners, Inc. v. United States*, 947 F.3d 794, 801 (Fed. Cir. 2020) (stating that "[a]n agency's interpretation of its own ambiguous regulation is controlling unless it is 'plainly erroneous or inconsistent with the regulation'") (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997) and *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019)). Nevertheless, the standard articulated in *Duferco Steel* is similar to both *Chevron* and *Auer/Kisor*, namely that the Court "afford[s] significant deference to Commerce's interpretation of a scope order, so long as Commerce's interpretation is not contrary to the order's terms and does not change the scope of the order." *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (cleaned up).

As noted above, the text of the *Orders* expressly defines "finished merchandise containing aluminum extrusions" as "parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." *AD Order*, 76 Fed. Reg. at 30,651.

Not only is Commerce's interpretation inconsistent with the plain language of the scope exemption for finished merchandise, but it also is contradicted by the very exemplars identified in the finished merchandise exclusion, all of which would be considered to be subassemblies

13

under Commerce's proposed definition for subassemblies, and therefore would fail Commerce's redefined finished merchandise test. All of these exemplars are "incorporated into a larger downstream product" after importation. There is no separate purpose to a standalone window or door; both need to be installed into buildings with frames and trim into a building wall. A picture frame is likewise used to house a picture. Finally, a solar panel has no function unless it is mounted with hardware, and connected to a broader solar panel energy system, including a battery. Under Commerce's current definition, none of these could come within the exclusion, and yet all are expressly stated in the scope language itself to be within the exclusion.

> 5. **Commerce's New Interpretation of the Finished Merchandise Exemption Leads to the Same Absurd Results That It Sought to Avoid in Its Previous Longstanding "Subassemblies Test" Interpretation.**

Importantly, Commerce does not write on a clean slate in interpreting the terms "subassemblies" and "finished merchandise." Beginning in 2012 with a ruling on Side Mount Valve Controls ("SMVCs"), Commerce established a long line of scope rulings in which it determined expressly that subassemblies *could* meet the finished merchandise test. Memo to the File, "Prior Scope Rulings Relevant to WKW Window Trim" (hereinafter "Prior Scope Rulings"), Attachment 2 (SMVCs), Antidumping Duty PD 50 at bar code 4083835-01 (Jan. 28, 2021) An SMVC is a product that is used in pumping apparatuses that are attached to fire engines. *Id*. at 6. Commerce explained that an SMVC is a product that "'manually controls water or foam pressure and foam in firefighting equipment, specifically from hoses or their pumper discharges, such as deck guns and monitors.'" Response of WKW to Comments of the AEFTC, at 5 & n.10, Antidumping Duty PD 37 at bar code 4015780-01 (Aug. 14, 2020) (hereinafter "WKW 8-14-21 Comments") (quoting *Initiation and Preliminary Scope Ruling on Side Mount Valve Controls* (Sept. 24, 2012) (ACCESS BARCODE 3098425-01), at 2).

Commerce summarized the SMVCs ruling as follows:

> In the initiation and preliminary scope ruling on SMVCs, the SMVCs at issue
> in that ruling entered the United States unassembled in kit form and were
> assembled and installed for use on fire trucks after importation. Commerce
> found in its final scope ruling that an SMVC is considered a "finished good"
> because they were [sic] "designed to work with other parts to form a larger
> structure or system." Commerce found that "subassemblies," *i.e.*, merchandise
> that is ["]partially assembled["] and "inherently part of a larger whole," were
> excluded from the *Orders* as "finished goods kits," so long as they contained
> all of the parts necessary to assemble a complete good, were ready for
> installation, and required no further finishing or fabrication.

Scope Ruling, at 8-9. Indeed, in referencing the SMVC precedent in later scope rulings,

Commerce explained that it had to reverse its analysis *from its pre-2012, pre-SMVC scope

rulings*, because it could lead to "unreasonable results." *See* Prior Scope Rulings, Attachment 2

(SMVCs), at 7. Commerce stated that "an interpretation of 'finished goods kit' which requires

all parts to assemble the ultimate downstream product may lead to absurd results, particularly

where the ultimate downstream product is, for example, a fire truck." *Id*. The same reasoning

that applies to a fire truck applies to an automobile.

The set of past scope rulings that Commerce has submitted for the record in this

investigation provides several examples in which it concluded that the products examined were

excluded under the "finished merchandise" exclusion, even though Commerce considered the

products to be subassemblies, and they rely on SMVCs (and thus obviously do not predate it).

In a ruling on Circle Glass Co.'s Screen and Storm Door Grille and Patio Door Kits, *see*

Prior Scope Rulings, Attachment 3 (Circle Glass Co. Patio Door Kits), Antidumping Duty PD 50

at bar code 4083835-01 (Jan. 28, 2021), Commerce cited SMVCs and a line of similar cases, in

which it stated that it would exclude, under the finished merchandise provision, "subassemblies

of larger products or systems provided that they enter the United States as finished goods or

finished goods kits and require no further fabrication." *Id*. at 12. Commerce stated that "the

screen and storm door grill enter as fully-assembled finished goods that are permanently

assembled, completed, and are ready to be attached to a screen or storm door with no further modification subsequent to importation." *Id*. Commerce concluded that "[a]s such, Circle Glass' screen and storm door grilles are fully assembled subassemblies ready for immediate installation and use in a larger system, thus analogous to the merchandise considered in the prior Motor Cases Housing Stators ruling, and eligible for the finished goods exclusion based on the same principle enumerated in the prior ruling." *Id*.

In Seagate Technology LLC's Head Stack Assemblies (hereinafter "HSAs"), *see* Prior Scope Rulings, Attachment 7, Antidumping Duty PD 51 at bar code 4083835-02 (Jan. 28, 2021), Commerce examined certain HSAs, which are components of hard disk drives ("HDDs"). *Id*. at 5. Commerce again cited the line of cases beginning with SMVCs, in which Commerce interpreted the finished merchandise exclusion "to include subassemblies of ultimate downstream products or systems provided that they enter the United States as fully and permanently assembled and completed at the time of entry and ready for installation in the downstream product with no further finishing or fabrication. *Id*. at 10. Commerce concluded that "the HSAs enter as fully-assembled finished merchandise that are [sic] permanently assembled and completed at the time of entry, and are ready to be installed in a downstream product, namely the HDD, with no further finishing or fabrication subsequent to importation." *Id*. at 11. Commerce thus concluded that "Seagate's HSAs are finished merchandise and should be excluded from the *Orders*." *Id*.

In a May 10, 2017 ruling on Ferguson Enterprises, Inc.'s Air Duct Fixtures, *see* Prior Scope Rulings, Attachment 9, Antidumping Duty PD 51 at bar code 4083835-02 (Jan. 28, 2021), Commerce examined air duct diffusers and registers, which direct the airflow of heating and cooling ducts, and are used in conjunction with heating and cooling systems. *Id*. at 6.

Commerce once again cited the SMVCs line of cases. *See, e.g.*, *id*. at 8 (discussing SMVCs). This scope ruling also discussed the effect of the Federal Circuit's holding in *Meridian Products LLC v. United States*, 851 F.3d 1375 (Fed. Cir. 2017). *Id*. at 12 & n.56. Commerce held that:

> … [W]e find that Ferguson's aluminum diffusers and registers meet the requirement in the scope definition that they enter into the United States as fully and permanently assembled products. Moreover, we note that Ferguson's air duct registers and diffusers work in conjunction with heating and cooling systems to direct airflow which is not an essential function of the heating and cooling system. As such, we find that Ferguson's air duct registers serve as a subassembly of the cooling or heating system rather than as an integral portion of the heating or cooling system itself.
>
> Furthermore, the Department revised its analysis of the finished merchandise and finished goods kits exclusions to include subassemblies of ultimate downstream products or systems provided that they enter the United States as fully and permanently assembled and completed at the time of entry and ready for installation in the downstream product with no further finishing….
>
> As such, we find these products meet the definition of the finished merchandise exclusion and, therefore, are excluded from the scope of the *Orders* as "finished merchandise."

*Id*. at 11-12.

In all of the above-described scope rulings, Commerce held that subassemblies can indeed qualify for the finished merchandise exclusion, as long as they enter the United States as fully and permanently assembled and completed at the time of entry, and are ready for installation in the downstream product with no further finishing. That conclusion carries forward Commerce's common-sense observation in the SMVC case that "an interpretation of 'finished goods kit' which requires all parts to assemble the ultimate downstream product *may lead to absurd results*, particularly where the ultimate downstream product is, for example, a fire truck." Prior Scope Rulings, Attachment 2 (SMVCs), at 7 (emphasis added). Contrary to Commerce's contention, these are not "old" cases with outdated analysis; they are consistent in their language and their conclusion. It is this case and the most recent cases that are outliers.

6. **The *Meridian* Federal Circuit Case Does Not Require Commerce to Rewrite the Definition of "Subassemblies" and "Finished Merchandise."**

In its Scope Ruling, Commerce tries to justify its abandonment of the rule in the longstanding SMVCs line of decisions by stating that "as a result of extensive litigation (and in particular, the holdings of the CIT and CAFC in *Meridian*), Commerce revised its interpretation of the scope of the *Orders* to bring it into compliance with the holdings of the Courts. Scope Ruling, at 27. But nothing in the *Meridian* opinions justifies Commerce's conclusion.

In the administrative proceedings below, WKW explained that the *Meridian* opinion does not compel the conclusion that its waist finishers are covered by the scope. Response of WKW to Comments of the AEFTC (hereinafter "WKW 7-13-20 Comments"), at 9, Antidumping Duty PD 32 at bar code 4000409-01 (July 13, 2020). The issue in the instant case "is solely whether a product that is directly analogous to the types of finished merchandise that are expressly excluded from the scope, also should be excluded from the scope." *Id*. The issue in the *Meridian* court cases, however, was different. "While it is true that the decision of the Federal Circuit in *Meridian* foreclosed the possibility of [Commerce] interpreting the scope to allow *some* "subassemblies" to be considered "finished merchandise" or "finished goods kits," *Meridian* does not require the Department to issue rulings leading to absurd results, such as an SMVC being deemed an in-scope aluminum extrusion because it is not imported with the full fire truck." WKW 8-14-20 Comments, at 6 (emphasis added).

In *Meridian Products*, the appeal *solely* turned on the question of whether certain aluminum extruded kitchen appliance door handles, imported into the United States along with plastic end caps, fit within the "finished goods kit" exemption. *Meridian Prods. LLC v. United States*, 890 F.3d 1272, 1278 (Fed. Cir. 2018). The "finished goods kit" exemption contained an exception in the scope language to the exemption, namely that "an imported product will not be

considered a 'finished goods kit' and therefore excluded from the scope of the [*Orders*] merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product." *Id*. at 1275 (quoting scope) (cleaned up). By contrast, the instant case does not involve the "finished goods kit" exemption and Commerce admits, that in any event, WKW's window trim products "contain a non-extruded aluminum component, as well as an aluminum extrusion 'as parts.'" Scope Ruling, as 24.

In *Meridian Prods.*, the Federal Circuit also observed that the record was unclear whether the handles in question were "fully and permanently assembled at the time of entry," and therefore potentially eligible for the "finished merchandise" exclusion. *Meridian Prods*., 890 F.3d at 1281-82 (Fed. Cir. 2018). As a result, the Federal Circuit remanded to this Court to clarify this factual point, and then to determine whether the exclusion applied. *Id*. at 1282. This Court in turn remanded the matter to Commerce to do precisely that. *Meridian Prods. LLC v. United States*, ___ CIT ___, ___, 357 F. Supp. 3d 1351, 1357 (2019). The result is what Commerce refers to as the *Meridian Door Handles Second Remand*. Commerce's determination in *Meridian Door Handles Second Remand*, in turn, went back to this Court for review, and the Court sustained it because no party filed comments with Commerce or to the Court objecting to it. *Meridian Prods., LLC v. United States*, No. 13-00246, 2020 WL 1672840, at *1 (Ct. Int'l Trade Apr. 6, 2020). In short, Commerce has provided no justification rooted in the actual underlying *Meridian* litigation to explain its *volte face* interpretation of the terms "subassemblies" and "finished merchandise" in *Meridian Door Handles Second Remand*.

For all of the above reasons, Commerce's attempt to rewrite the plain language of the scope in the *Orders* should be overturned by this Court as not in accordance with law.

**C.** **Commerce's Scope Determination Is Unsupported by Substantial Evidence Because It Ignores Record Evidence That WKW's Waist Finishers, Belt Moldings, and Outer Waist Belts Require No Further Finishing or Fabrication, and Are Fully and Permanently Assembled and Completed at the Time of Entry, and Therefore Constitute Finished Merchandise.**

**1.** **WKW Presented Significant Record Evidence That WKW's Waist Finishers, Belt Moldings, and Outer Waist Belts Is Finished Merchandise.**

WKW presented substantial evidence that its waist finishers, belt moldings, and outer waist belts require no further finishing or fabrication, and are fully and permanently assembled and completed at the time of entry. Commerce points to no record evidence to the contrary.

At the time of importation, WKW's waist finishers, belt moldings, and outer waist belts require no further finishing or fabrication after importation, but are then ready to be installed directly onto an automobile. The aluminum is fabricated into a specific shape as requested by the automobile manufacturer. 6-28-19 Scope Request, at 3. A rubber seal is then attached to each of these aluminum parts prior to importation. *Id*. This seal is designed to prevent liquid or other materials from entering into the interior of the automobile after the complete downstream assembly. *Id*. When imported, these products are fully fabricated and finished, and do not require any further fabrication or additional work prior to their installation by OEMs directly onto the automobile chassis. *Id*.

It is only when the rubber seal is fabricated and added to the extruded aluminum trim—all done *prior* to importation—that a finished, completed, waist finisher, belt molding, or outer waist belt results. WKW 7-13-20 Comments, at 7.

WKW's automobile window trim is not designed to fit into another *component or assembly*. WKW Letter re Schletter Grounding Clamps Ruling, at 2-3, Antidumping Duty PD 38 at bar code 4019281-01 (Aug. 24, 2020). Rather, WKW sends the trim with a seal, *as is*, to the OEM that attaches the product. *Id*. at 3. The OEM operates as an assembly line in which the

OEM directly attaches the trim with the seal to the relevant portion of the vehicle. *Id*. WKW

has provided pictures of these products, attached to this brief as Appendix A. As explained by

WKW automotive trim expert James Goodson:

> As the Program Manager at the facility, and in my capacity as an automotive-
> focused engineer and the engineer for vehicle trim, I can testify that vehicle
> trim is not a "subassembly." The OEM does nothing to the trim prior to
> assembly. Rather, the trim is an assembly in its own right because the OEM
> attaches it directly to the relevant portions of the painted vehicle.

Goodson Affidavit ¶ 10. Thus, it is clear from the administrative record—indeed undisputed—

that WKW's waist finishers, belt moldings, and outer waist belts enter the United States fully

and permanently assembled and completed at the time of entry, and are ready to be attached in

the downstream product with no further finishing.

> ## 2. The Court Should Reject Commerce's Attempt to Portray WKW's Waist Finishers, Belt Moldings, and Outer Waist Belts as Somehow "Unfinished" Based on an "Independent Function" Test.

In addition to proving that its trim enter the United States fully and permanently

assembled, and ready for use in automobiles with no further finishing, WKW also explained that

"[t]he final waist finisher has the independent function of keeping out elements and noise in an

automobile. WKW 7-13-20 Comments, at 7. In response, Commerce states the following in its

scope ruling:

> In order to perform their function of keeping road debris, rain, noise, and
> outside elements from entering the car, WKW's window trims must *work in
> tandem with* the glass of the car window and the car door. Therefore, we agree
> with the petitioner that WKW's window trims are more akin to window frame
> components or door parts, and therefore are not "finished merchandise."

Scope Ruling, at 24 (emphasis added). Commerce superimposed a separate requirement—that a

product not work in tandem with other components of a larger product—even though a door

works in tandem with a wall.

In a similar vein, Commerce states:

> We find that the window trims would not constitute finished merchandise
> because, at the time of entry into the United States, the window trims do not
> constitute a fully and permanently assembled and completed product *with its*
> *own function independent of* the completed automobile.

*Id.* (emphasis added).

This finding is unreasonable, and therefore is unsupported by substantial evidence. Commerce's reasoning here as to what constitutes "finished merchandise" glosses over the fact that complex products often contain many assemblies with independent functions that are fully finished merchandise in their own right. Sometimes these assemblies are sold in the aftermarket rather than strictly to OEMs, even though they are made to work in tandem with other assemblies. Commerce's error arises out of the same flawed logic that led it to conclude that a "subassembly" could not be "finished merchandise"; nothing in the *Orders* identifies "finished merchandise" as a product that must be used in a standalone fashion. Indeed, a door cannot function as it is intended to unless it is fastened to a wall.

Commerce's newly-minted interpretation, as first articulated in *Meridian Door Handles Second Remand*, is not a serious analysis of the finished merchandise exclusion, but instead is just a way of short-circuiting the finished merchandise test by asserting that any product that ultimately is incorporated to or designed to work with other products in a downstream product must *ipso facto* be a subassembly, and any subassembly, in turn, is *ipso facto* ineligible for consideration as finished merchandise. That position completely contradicts Commerce's line of cases beginning with SMVCs. A prime example is Seagate Technology LLC's Head Stack Assemblies ("HSAs"), as discussed in Section II.B.5 above. There, Commerce interpreted the finished merchandise exclusion "*to include subassemblies of ultimate downstream products* or systems provided that they enter the United States as fully and permanently assembled and completed at the time of entry and ready for installation in the downstream product with no

further finishing or fabrication.  HSAs, at 10 (emphasis added).  Commerce concluded that "the

HSAs enter as *fully-assembled finished merchandise* that are [sic] permanently assembled and

completed at the time of entry, *and are ready to be installed in a downstream product*, namely

the HDD, *with no further finishing or fabrication subsequent to importation*."  *Id*. at 11

(emphasis added).  Commerce thus concluded that "Seagate's HSAs are finished merchandise

and should be excluded from the *Orders*."  *Id*.

WKW's waist finishers indisputably meet Commerce's longstanding past practice, as

embodied in the SMVCs line of cases, including HSAs.  WKW elaborated as follows:

> The final waist finisher has the independent function of keeping out elements
> and noise in an automobile.  This is akin to "finished windows with glass" or
> "doors with glass or vinyl," which are destined for use in homes, both mobile
> and stationary, and commercial buildings, both of which fit squarely within the
> finished merchandise exemption.  A window frame, *by itself*, cannot perform
> the function of keeping out elements such as rain and snow and noise, and
> therefore cannot constitute "finished merchandise."  Similarly, a door frame,
> *by itself*, cannot perform the independent function of keeping out elements and
> noise, and therefore cannot constitute "finished merchandise."  But when a
> window frame and glass are incorporated together into "finished windows with
> glass," or a door frame is combined with other materials to constitute a "door
> with glass or vinyl," the resulting product *does* perform the independent
> function of keeping out elements and noise from a house, mobile home or
> commercial property.  The same is true with the waist finishers.  Neither the
> aluminum trim by itself, nor the rubber seal by itself, can perform the
> independent function of keeping out elements and noise, but together form a
> finished product that accomplishes this function.  Imagine sitting in the
> driver's seat and getting soaked from water that has seeped through your
> window.  Or having noise and dirt come through the crack in the window
> without weather seals, thereby resulting in mold and rust on the interior of the
> car.  As such, no conceptual difference exists between an extruded window
> frame with glass, an extruded door frame with a door, or extruded waist
> finisher with a rubber weatherization seal for use in an automobile.  All of
> these finished goods perform the exact same function: performing water, snow,
> ice, heat, noise, etc. from entering a house, building, or vehicle.
>
> Although the extruded aluminum trim by itself would constitute a subassembly
> that falls within the scope of the Orders, when combined with the rubber
> weather seal, the resulting waist finishers perform the independent function of
> keeping out elements and noise from automobiles.  It does not matter that waist

finishers are further incorporated downstream into an automobile, any more than it matters that finished windows with glass, or doors with glass or vinyl, are incorporated into houses or other buildings. All three cases—the finished windows with glass, the doors with glass or vinyl, and the waist finisher with aluminum extrusion and rubber—form the independent function of keeping out the elements of rain, snow, and dust and noise from a house or automobile. If extruded window frames with glass and extruded door frames with a door are examples of finished merchandise, then no conceptual difference exists between WKW's waist finishers and the examples of finished merchandise specified in the scope. Moreover, the fact that WKW's waist finishers are incorporated into a vehicle does nothing to diminish its categorization as finished merchandise, the same as when a glass window is installed in a home. Although the waist finishers are incorporated into a vehicle, it is exactly, the same conceptually as a door being incorporated into a house or building. As such, WKW's waist finishers meet the scope exclusion for finished merchandise just as much as finished windows with glass, or doors with glass or vinyl for use in homes, and businesses.

WKW 7-13-20 Comments, at 7-9. Moreover, WKW submitted a website page that showed how weather seals and auto trim for waist finishers are advertised and sold in the aftermarket. WKW 7-13-20 Comments, at 8 n.16 & Attachment 5, Antidumping Duty PD 33 at bar code 4000409-02 (July 13, 2020).

Nowhere in its Scope Ruling does Commerce dispute any of these facts. Instead, Commerce rests its entire case on its rewriting of the scope language of the *Orders*, and asks this Court to disregard Commerce's long line of previous scope rulings that establish that subassemblies containing aluminum extrusions as parts can meet the finished merchandise exclusion as long as the products require no fabrication or finishing, and are fully and permanently assembled and completed at the time of entry. Commerce has never explained why its interpretation has changed, other than the theory that a subassembly *ipso facto* can never be finished merchandise. But nothing in the scope language of the *Orders* compels such a conclusion.

Because Commerce does not (and cannot) point to any record evidence to dispute the facts presented by WKW, and Commerce does not explain why its interpretation has changed

from the long line of scope rulings beginning with SMVCs (other than cases that in fact mandated no such change in interpretation), this Court should hold that Commerce's Scope Determination is unsupported by substantial evidence.

**D.    Commerce's Scope Determination Is Unsupported by Substantial Evidence Because It Does Not Perform Any Real Analysis of the (k)(1) Sources.**

As noted above in Section III.B.6, there is nothing in the Federal Circuit's *Meridian* cases that compelled Commerce to rewrite the terms "subassemblies" or "finished merchandise" in the scope of the *Orders*.  There is also nothing in the sources cited in Commerce's regulations that compel such a rewrite.

Commerce's regulations stipulate that in making its scope determination, it "will" take into account "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."  19 C.F.R. § 351.225(k)(1) (hereinafter the "(k)(1) sources").

In this case, however, Commerce performed no real analysis of the (k)(1) sources, other than summarizing several past scope rulings concerning the "finished merchandise" and "finished goods kits" exemptions to the *Orders*.  Neither the petition, the original investigation by Commerce, nor the injury investigation by the U.S. International Trade Commission ("ITC") mention waist finishers, belt moldings, outer waist belts, or any similar types of products, either as examples of products that are intended to be covered by the scope of the *Orders*.  Moreover, none of these sources ever discuss the notion that an assembly like WKW's waist finishers, belt moldings, and outer waist belts cannot qualify for the finished merchandise exemption because it is attached to another product (such as an automobile).  Commerce certainly does not point to any of these sources to support its recent *volte face* interpretation of the scope.  Instead, the only (k)(1) source type that is discussed in Commerce's determination is its prior scope rulings.

As discussed above in section B.5, a long line of these rulings interpreted the *Orders* in a manner consistent with Plaintiff's interpretation, *i.e.*, subassemblies or assemblies can qualify for the finished merchandise exclusion, if they are permanently assembled and completed at the time of entry, and are ready to be installed into a downstream product, with no further finishing or fabrication subsequent to importation. A detailed examination of all of the prior scope rulings to which Commerce cites in the administrative record, taken as a whole, provides more support for WKW's position that its trim products are *outside* the scope than Commerce's position that these products are *within* the scope. A review of the 16 attachments in Commerce's prior rulings memo is provided below:

| Attachment | Ruling Name | Holding |
|---|---|---|
| 1 | Certain Decorative Waste Containers (Prior Scope Rulings, Antidumping Duty PD 50 at bar code 4083835-01) | Aluminum not extruded; no relevant holding re scope exclusions. |
| 2 | Side Mount Valve Controls (SMVCs) (Prior Scope Rulings, Antidumping Duty PD 50 at bar code 4083835-01) | SMVCs are excluded as subassemblies that constitute finished goods kits, even though kit does not include all parts to assemble the *downstream* product. |
| 3 | Circle Glass Co. Screen and Storm Door Grille and Patio Door Kits (Prior Scope Rulings, Antidumping Duty PD 50 at bar code 4083835-01) | Screen and storm door grille qualifies for finished merchandise exclusion, because it is a subassembly of a larger product or system and enters the United States as finished goods and requires no further fabrication. Cites SMVCs and several other rulings with similar holdings. Patio door kits do not qualify for finished goods kit exclusion, because the kit does not include the screen, which must be purchased separately. |
| 4 | Signature Partners Auto Trim Kits (Prior Scope Rulings, Antidumping Duty PD 50 at bar code 4083835-01) | Auto trim kits do not qualify for finished goods kit exclusion, because after entry into the U.S., the kit components are combined with U.S.-sourced decorative and functional accessories to form auto trim kits that are then sold to the customer. |

| 5 | *Shenyang Yuanda* (Prior Scope Rulings, Antidumping Duty PD 50 at bar code 4083835-01) | CAFC appeal opinion, *Shenyang Yuanda Alum. Indus. Eng'g Co., Ltd. v. United States*, 776 F3.d 1351 (Fed. Cir. 2015), not a scope ruling, and therefore not a (k)(1) source. Parts for curtain walls are explicitly included in scope of *Orders*. Finished merchandise exclusion does not apply, because parts for curtain walls cannot be construed to mean finished merchandise. |
|---|---|---|
| 6 | Fittings for Cooling Systems (Prior Scope Rulings, Antidumping Duty PD 50 at bar code 4083835-01) | Various fittings to make cooling components and engineered cooling systems do not qualify for finished merchandise exclusion because they are solid aluminum products and contain no non-extruded-aluminum components. |
| 7 | Seagate Head Stack Assemblies (Prior Scope Rulings, Antidumping Duty PD 51 at bar code 4083835-02) | Head stack assemblies ("HSAs"), which are components of hard disk drives ("HDDs"), qualify for finished merchandise exclusion, because HSAs enter as fully-assembled finished merchandise that are permanently assembled and completed at the time of entry, and are ready to be installed into a downstream product (the HDD), with no further finishing or fabrication subsequent to importation. Cites SMVCs and several other rulings with similar holdings. |
| 8 | Ferguson Bathroom Fixtures Kits (Prior Scope Rulings, Antidumping Duty PD 51 at bar code 4083835-02) | Towel bar, towel ring, and toilet paper holder kits qualify for finished merchandise kits. Only significant issue discussed is whether certain zinc alloy die-cast posts and steel springs go beyond "mere fasteners" and qualify for the non-extruded-aluminum component requirement of the test. |
| 9 | Ferguson Air Duct Fixtures (Prior Scope Rulings, Antidumping Duty PD 51 at bar code 4083835-02) | Air duct diffusers and registers, which direct the airflow of heating and cooling ducts, and are used in conjunction with heating and cooling systems, qualify for the finished merchandise exclusion. Found that the air duct registers serve as a subassembly of the cooling or heating system, rather than as an integral portion of the heading or cooling system itself. Held that finished merchandise and finished goods kit exclusions include subassemblies of ultimate downstream products provided that they enter the U.S. as fully and permanently |

| | | assembled and completed at the time of entry, and ready for installation in the downstream product with no further finishing or fabrication. Cites SMVCs and several other rulings with similar holdings. |
|---|---|---|
| 10 | Sputtering Target Backing Plates (Prior Scope Rulings, Antidumping Duty PD 51 at bar code 4083835-02) | Aluminum not extruded; no relevant holding re scope exclusions. |
| 11 | Meridian Door Handles Second Remand (Prior Scope Rulings, Antidumping Duty PD 52 at bar code 4083835-03) | CIT opinion ordering further agency proceedings in compliance with mandate of CAFC in *Meridian Prods., LLC v. United States*, 890 F.3d 1272 (Fed. Cir. 2018). *See* Section III.B.6 above.[3] |
| 12 | Fasnap Boat Telescoping Poles (Prior Scope Rulings, Antidumping Duty PD 52 at bar code 4083835-03) | Boat telescoping poles, which are designed to support boat covers, which work with removable or interchangeable attachments, and which can be sold with or without boat cover vent cap, meets the finished merchandise exclusion. Held that it was unreasonable to require that interchangeable attachments be included at time of entry to qualify for finished merchandise exclusion. Boat telescoping poles are not a subassembly, because they are separate product with their own specific purpose, and are not designed to be part of a downstream final product. |
| 13 | Air Master Aluminum Jalousie Shutters (Prior Scope Rulings, Antidumping Duty PD 52 at bar code 4083835-03) | Aluminum jalousie shutters do not qualify for finished merchandise exclusion or finished goods kit exclusion, because they lack crank and operating mechanism that would enable them to function as jalousie shutters. |
| 14 | CCM Solar Mounts (Prior Scope Rulings, Antidumping Duty PD 52 at bar code 4083835-03) | Solar roof mountings, which are designed to mount solar panels on a roof, do not qualify for finished merchandise exclusion, because they do not constitute a fully and permanently assembled and completed solar |

---

[3] This document in the Prior Scope Rulings Memo is *not* the actual *Meridian Door Handles Second Remand*. The *Meridian Door Handles Second Remand* can be found at Comments on WKW's Scope Ruling Request, Exhibit 1 at 20-23, Antidumping Duty PD 14 at bar code 3868681-01 (July 25, 2019)). For a discussion of *Meridian Door Handles Second Remand*, *see* Section III.B.6 above.

| | | panel mounting system. They also do not qualify for finished goods kit exclusion, because at time of entry, they do not include all parts necessary to fully assemble a finished solar panel mounting system. |
|---|---|---|
| 15 | Schletter Grounding Clamps (Prior Scope Rulings, Antidumping Duty PD 52 at bar code 4083835-03) | Grounding clamps designed for securing solar panels to solar panel racking system and grounding the solar panel racking systems to prevent electrocution, do not qualify for finished merchandise exclusion. The grounding clamps do not qualify because they do not constitute a fully and permanently assembled and complete solar panel mounting system. They also do not qualify for finished goods kit exclusion, because at time of entry, they do not include all parts necessary to fully assemble a finished solar panel mounting system. |
| 16 | *Whirlpool* (Prior Scope Rulings, Antidumping Duty PD 52 at bar code 4083835-03) | CIT opinion in *Whirlpool Corp. v. United States*, ___ CIT ___, 144 F. Supp. 3d 1296 (2016), CAFC opinion in *Whirlpool Corp. v. United States*, 890 F.3d 1302 (Fed. Cir. 2018), and CIT opinion in *Whirlpool Corp. v. United States*, ___ CIT ___, 357 F. Supp. 3d 1358 (2019). These are not scope rulings, and therefore are not (k)(1) sources. Case concerned imported door handles for kitchen appliances. None of these courts ruled whether Whirlpool's products met the finished merchandise exclusion. CAFC remanded case to determine whether Whirlpool's assembled handles meet the requirements for the finished merchandise exclusion, and 2019 CIT case executed CAFC mandate by remanding back to Commerce to determine the same. |

As can be seen from the summaries above, a majority of the relevant scope determinations that Commerce summarized and submitted for the administrative record actually support WKW's position. As a result of those supportive scope rulings, this Court should conclude that the (k)(1) sources are dispositive in favor of WKW and thus Commerce's determination is unsupported by substantial evidence.

A few of the later scope rulings, as discussed above, did reflect Commerce's recent *volte face* interpretation of the scope, based on the same unlawful rewriting of the terms of the *Orders* contrary to the plain scope language. This began with brief summaries of the *Meridian Door Handles Second Remand* (2019) (described in more detail elsewhere in Scope Ruling); *Fasnap Boat Telescoping Poles* (2019), (products met the finished merchandise exemption because they "were not designed to be part of a downstream final product"); *Air Master Aluminum Jalousie Shutters* (2019) (products did not meet the finished merchandise exemption, but on different grounds, regarding post-importation assembly processes); *CCM Solar Mounts* (2020) (solar mounts lacked necessary components to function as a solar panel mounting system); *Schletter Grounding Clamps* (grounding clamps lacked necessary components to function as a solar power mounting system). *See* Scope Ruling, at 11-14. But even in these cited scope determinations, Commerce does not explain why these later scope determinations constitute substantial evidence in support of Commerce's apparent decision in 2019 to contradict all of its previous scope rulings and issue interpretations based on its newly minted redefinition of the "subassemblies" and "finished merchandise" scope terms that were already unambiguously defined in the scope language of the *Orders*.

Accordingly, if the Court does not reverse Commerce's determination on the basis of the unambiguous scope language, then Commerce should reverse Commerce's determination because the (k)(1) sources provide dispositive evidence that the finished merchandise exemption in *Orders* covers WKW's waist finishers. Finally, if the Court determines that the (k)(1) sources are not dispositive, then the Court should remand and direct Commerce to perform a (k)(2) analysis.

## IV.    CONCLUSION AND PRAYER FOR RELIEF.

For the above reasons, the Court should conclude that Commerce's Scope Ruling is not in accordance with law because Commerce has interpreted the *Orders* in a manner contrary to the *Orders'* unambiguous terms, by setting aside the definitions of the terms "subassemblies" and "finished merchandise" specified in the *Orders* themselves, and substituting them with different definitions out of whole cloth.

The Court should also hold that Commerce's Scope Ruling is unsupported by substantial evidence—*i.e.*, unreasonable—because Commerce ignored unrebutted record evidence that WKW's waist finishers, belt moldings, and outer waist belts require no further finishing or fabrication, and are fully and permanently assembled and completed at the time of entry, and therefore constitute finished merchandise.

Finally, the Court should rule that Commerce's Scope Ruling is unsupported by substantial evidence based on a review of the (k)(1) sources.  WKW believes that the (k)(1) sources are dispositive in its favor and merits reversal, but if the Court rules that the (k)(1) sources are not dispositive, the Court should remand with instructions for Commerce to consider the (k)(2) factors.

Respectfully submitted,

/s/ Richard P. Ferrin
Douglas J. Heffner
Richard P. Ferrin (lead)
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803
*Counsel for Plaintiff*

June 21, 2021

/s/ Leslie A. Glick_____
Leslie A. Glick
**BUTZEL LONG**
1909 K Street, N.W.
Washington, DC 20006
(202) 454-2839
*Counsel for Plaintiff*

**Certification of Compliance With Chambers Procedure 2(B)(2)**

The undersigned hereby certifies that the foregoing brief contains 10,054 words, exclusive of the table of contents, table of authorities, and counsel's signature block, and therefore complies with the maximum word count limitations of 14,000 words for primary briefs set forth in the Chamber Procedures of the U.S. Court of International Trade.

/s/ Richard P. Ferrin                              /s/ Leslie A. Glick

Douglas J. Heffner                                    Leslie A. Glick

Richard P. Ferrin (lead)                            **BUTZEL LONG**

**FAEGRE DRINKER BIDDLE & REATH LLP**      1909 K Street, N.W.

1500 K Street, N.W.                               Washington, DC 20006

Washington, DC 20005                         (202) 454-2839

(202) 230-5803                                     *Counsel for Plaintiff*

*Counsel for Plaintiff*

                                     On behalf of Plaintiff WKW North America, LLC